[Docket Nos. 36-37.]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

UNITED STATES OF AMERICA,

v.

HASAAN SAVERY,

           Defendant.

Crim. No. 24-551 (RMB)

**OPINION**

**RENÉE MARIE BUMB, Chief United States District Judge:**

Defendant Hasaan Savery asks this Court to suppress a handgun, drugs, and cash that New Jersey State Police officers found in his satchel during a warrantless stop and search. Savery argues the police unlawfully searched the satchel, and so, the exclusionary rule bars the Government from using any evidence found in it against him at trial. He also asks this Court to dismiss his pending charge for being a felon-in-possession of a handgun and ammunition, in violation of 18 U.S.C. § 922(g)(1). He contends § 922(g)(1) is facially invalid and unconstitutional as applied to him because the statute violates his Second Amendment rights to keep and bear arms.

For the below reasons, this Court **DENIES** both motions without an evidentiary hearing.[1] [Docket No. 36-37.]

---

[1] The Court held oral argument on Savery's motion to suppress on April 9, 2025.

## I. BACKGROUND[2]

### A. The Drug Investigation and Savery's Arrest

In July 2023, members of the New Jersey State Police (NJSP) Crime Suppression South Unit (CSSU) learned from a confidential informant that Savery sold crack cocaine and heroin throughout Atlantic City. [Gov't Mem. of Law in Opp'n to Def. Mot. to Suppress 2 (Gov't Br. I), Ex. B at 3-5 (NJSP Investigation Report) (Docket Nos. 43, 43-2).] CSSU members then orchestrated two successful controlled buys where an informant bought crack cocaine from Savery. [*Id.*]

At the end of August 2023, CSSU members orchestrated a third controlled buy from Savery. [*Id.* at 1-2.] The officers gave the informant $300 and listened in as the informant phoned Savery to setup a drug deal. [*Id.* at 2.] The officers then watched the informant meet Savery in a parking lot and engage in a hand-to-hand drug transaction. [*Id.*] After the deal, the officers met with the informant who turned over the cocaine that Savery had just sold him. [*Id.*]

What happened next is largely captured on the officers' body worn cameras. The officers approached Savery as he walked toward the entrance of an apartment unit. [Def. Mem. of Law in Supp. of Mot. to Suppress 2, Ex. 2 (Body Camera Video) (Def. Br. I) (Docket No. 36-1).] Detective Sergeant Jorge Rivera first approached Savery to arrest him, but Savery refused to comply by trying to enter the apartment unit. [Gov't Br. I at 2; Def. Ex. 2.] At that

---

[2] The Court takes the following facts from the parties' motion papers and the exhibits annexed thereto, including multiple videos taken from the police officers' body worn cameras. The Government and Savery agree an evidentiary hearing is unnecessary. [Gov't Mem. of Law in Opp'n to Def. Mot. to Suppress 11-12 Docket No. 43); Def. Reply Memorandum of Law in Supp. of Mot. to Dismiss 14 (Docket No. 50).] The parties ask this Court to resolve the motion based on the existing evidentiary record. [*Id.*]

time, Savery wore a black, cross-body satchel. [Def. Ex. 2.] Another officer raced to assist

Rivera. [*Id.*] Savery grabbed his satchel as he continued to resist the officers, depicted below:



[Id.; *see also* Def. Ex. 3 (Body Camera Video).]

Eventually, more officers arrived and wrestled Savery to the ground. [Def. Exs. 2-3.]

Once on the ground, Savery laid face down on top of the satchel. [*Id.*] The officers handcuffed

Savery and turned him onto his side, which allowed one officer to release the satchel and

remove it from Savery's body. [Gov't Ex. C (Body Camera Video).] That officer then

temporarily placed the satchel on a nearby ledge before handing it to another officer as seen

below:



[Def. Exs. 2-3.] The other officer then unzipped the satchel and looked inside. [Def. Ex. 3.]

While not shown on video, an officer (presumably the one who searched the satchel) said,

"And you've got your gun in here." [Def. Ex. 2.] The officers then escorted Savery to a police cruiser for transport to a police facility. [Gov't Br. I at 4 (citing Ex. A).]

Meanwhile, Ashley Sanchez—the resident of the apartment that Savery tried to gain entry to—remained inside the apartment during the officers' attempt to arrest Savery. [Def. Br. I at 5.] After the officers arrested Savery and escorted him off property, one officer spoke to her. [Gov't Ex. D (Body Camera Video).] Sanchez told the officer that Savery does not live there and that he had visited earlier to see his daughter. [*Id.*] During that conversation, the officer who searched Savery's satchel showed it to her, telling her, "This is what [Savery] was trying to give back to you, look in there, that's a gun right there." [*Id.*]

The officers eventually recovered from Savery's satchel: (1) a privately manufactured 9mm pistol, loaded with twenty-five rounds of ammunition; (2) a plastic bag containing suspected crack cocaine; (3) a plastic bag containing prescription pills (suspected oxycodone); and (4) $300 cash. [Def. Br. I at 5 (citing Ex. 1); NJSP Investigation Report at 6-7.] The serial numbers on the $300 cash matched the serial numbers on the cash the officers gave the informant before the controlled buy with Savery. [Def. Br. I. at 5 (citing Ex. 1); NJSP Investigation Report at 7.] A federal grand jury ultimately indicted Savery for distributing and possessing with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and being a felon-in-possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). [Docket No. 29.] According to the Government, Savery has multiple drug-trafficking convictions (spanning from 2012 through 2014, each carrying a prison term), and a resisting arrest conviction. [Gov't Br. I, Ex. A; *see also* Gov't Mem. of Law in Opp'n to Def. Mot. to Dismiss 4-5 (Gov't Br. II) (Docket No. 49).]

**B. NJSP's Standing Operating Procedures on Prisoner Care, Handling, and Transportation and Evidence/Property Control**

At the time the police arrested Savery, the NJSP had Standing Operating Procedures (SOP) on caring, handling, and transporting prisoners (SOP F4) and on evidence and property control (SOP D6).  [Gov't Ex. E (Docket No. 43-5); Docket No. 54-1).]

SOP F4 requires officers to search arrestees right after arrest "to prevent the destruction of evidence, ensure the safety of the arresting [officer] and prevent possible harm to the prisoner or other persons[.]"  [SOP F4 at 5.]  Before transporting an arrestee in a police vehicle, the arresting officer must "conduct a proper, thorough, and systematic search" of the arrestee.  [*Id*.]  The arresting officer must remove from the arrestee:  (1) "[p]roperty carried unlawfully[;]" (2) "[a]ny property dangerous to life, or which could facilitate escape (e.g., cellphone, keys, ID cards)[;]" (3) "[p]roperty required as evidence[;]" and (4) "[i]tems that are recovered during a search, which could prove evidentiary in nature[.]"  [*Id.*]  The SOP also requires the arresting officer to remove "[p]urses/wallet" from the arrestee's "possession" and to keep it in the officer's "custody . . . until thoroughly searched."  [*Id*.]

On top of that "initial search at the scene of arrest," SOP F4 requires an unarmed officer to conduct a "second search" when the arrestee "is brought into a NJSP facility" before placing the arrestee in a holding room or cell.  [*Id.* at 7.]  During that second search, the officer must "thoroughly search[] for weapons, contraband, or any potentially dangerous articles on [the arrestee's] person or clothing."  [*Id.*]  The officer must also remove "any devices and/or items which [the officer] deem[s] inappropriate or unnecessary" like "cellphones, keys, ID's[.]"  [*Id.*]  SOP F4 requires "[a]ll property or evidence seized or taken into custody" to "be handled and processed in accordance with [SOP D6]."  [*Id.*]

SOP D6 details property and evidence impoundment procedures.  [SOP D6 at 7-23.]  It requires officers to "immediately secure and process . . . impounded evidence/property" as soon as the officer takes possession of it.  [*Id.* at 7.]  Officers must handle the evidence or property with "extreme care until a determination can be made that the items are safely secured and pose no threat to anyone."  [*Id.*]  Officers must "secure[] . . . [a]ll impounded items . . . in [a] troop transportation" and transport the item "as soon as practical to a secure evidence processing facility[,]" such as a "station, unit office" and so on.  [*Id.*]  Once an officer has transported the "impounded property . . . to a secure evidence facility," the officer must place the property "into the temporary evidence locker until the [officer] and a supervisor" are ready to process the items (classifying, marking/tagging, inventorying, packaging, sealing, and so on).  [*Id.* at 9-13.]  The officer must classify "impounded property" as "Evidence, Investigative, Stolen, or Safekeeping/Found."  [*Id.* at 9.]  SOP D6 requires officers—"[a]t a minimum"— to "document the circumstances of how evidence/property was acquired and a description of the evidence/property."  [*Id.*]  The SOP also details how an officer is to return property to the "a lawful owner[.]"  [*Id.* at 17-21.]

Following Savery's arrest, NJSP Detective Radetich prepared an investigation report about CSSU's investigation into Savery and his ultimate arrest (discussed above).  [NJSP Investigation Report at 1-8.]  In his report, Radetich discussed the search of Savery's satchel, describing it as a "search incident to arrest."  [*Id.* at 6.]  The detective also described how the items recovered from Savery's satchel were logged into evidence, including storage, packaging, and marking for identification.  [*Id.* at 7-8.]

## II. THE MOTION TO SUPPRESS

The Government argues that the police lawfully searched Savery's satchel under the search-before-transportation and inventory search doctrines. [Gov't Br. at 6-10.] Pointing to the Third Circuit's decision in *United States v. Mathews*, the Government contends the police do not need a search warrant to search a bag on an arrestee's person when the bag must accompany the arrestee to the police station. [*Id.* at 7 (citing 532 F. App'x 211, 224 (3d Cir. 2013)).] The Government explains that the police arrested Savery in a public place, and needed to transport him and the satchel to the police station. [*Id.* at 8.] Given *Mathews*, the Government contends the police needed to search the satchel before transport "to locate and secure any dangerous items[.]" [*Id.*] Accordingly, the on-scene search was lawful.

Next, pointing to SOP F4, the Government argues NJSP's department policy required the officers to search Savery's satchel both at the scene and a NJSP facility. [*Id.* at 8-9.] Given SOP F4, the Government contends the warrantless search was a permissible inventory search. [*Id.*] For example, the Government explains that an arresting officer must take possession of an arrestee's wallet or purse "until thoroughly searched" before transporting the arrestee to a police facility. [*Id.* at 8.] Once at the facility, the Government notes SOP F4 required officers to search Savery and his satchel again. [*Id.* at 10.] Because NJSP policy mandated those searches, the Government contends the police lawfully recovered the evidence from Savery's satchel. [*Id.*]

Lastly, the Government argues the inevitable discovery doctrine precludes suppression. [*Id.* at 10-11.] The Government explains that NJSP had been investigating Savery for drug-trafficking and had probable cause to arrest him given the controlled purchases of drugs. [*Id.*] Accordingly, the Government contends the police would have

"inevitably discover[ed]" the gun, ammo, and drugs in Savery's satchel after lawfully arresting him for the controlled buys.  [*Id.*]

Savery counters, arguing the Government cannot rely on the search-before-transportation and inventory search doctrines because neither apply here.  [Def. Reply Memorandum of Law in Supp. of Mot. to Dismiss 2-13 (Def. Reply Br. I) (Docket No. 50).][3]

Starting with the search-before-transportation doctrine, Savery argues *Mathews* is inapplicable.  First, Savery contends that *Mathews*' "narrow" holding does not apply here since the police arrested him on the porch of a private apartment unit belonging to his child's mother, and the Government offers no evidence that the police had to transport his satchel from the scene.  [*Id.* at 3-4.]  He points out the officers placed the satchel on a ledge on the porch following his arrest, and the officers could have left it there.  [*Id.* at 4.]  Given those facts, *Mathews* does not apply.  Second, Savery argues *Mathews* is a non-precedential decision that is not binding on this Court.  [*Id.* at 4.]  He then argues that *Mathews* is wrong on the law, and notes that one member of that Third Circuit panel refused to adopt the search-before-transportation exception.  [*Id.* at 4-6.]  Savery contends that the United States Supreme Court has recognized only a few exceptions to the warrant requirement, and *Mathews*' search-before-transportation exception is not one of them.  [*Id.* at 5-9.]

Next, Savery argues the Government cannot rely on the inventory search doctrine. [*Id.* at 9-12.]  Savery contends that the police lacked any authority to seize his satchel, and the inventory doctrine does not apply to seizures.  [*Id.* at 9, 12.]  He then argues that the

---

[3] Savery initially argued the Government could not rely on the search incident to arrest exception to justify the warrantless search of his satchel.  [Def. Br. I at 10-14.]  The Government is not relying on that exception.  [Gov't Br. I. at 7, n.5.]  Accordingly, the Court will not discuss Savery's arguments about whether the search incident to arrest exception applies.

SOP F4 is not an established policy "designed to produce an inventory" and does not appear to give arresting officers any "discretion at all concerning the searching of luggage of other items transported with an arrestee." [*Id.* at 11.] Savery adds that SOP F4 does not provide any protocols for searching personal items like wallets or purses. [*Id.*] He also argues that the on-scene search of his satchel was not an inventory search, but a targeted search to uncover incriminating evidence. [*Id.* at 10-11.]

Finally, Savery contends the Government cannot rely on the inevitable discovery doctrine. [*Id.* at 13.] Savery does not dispute the police had probable cause to arrest him. [*Id.*] Notwithstanding that fact, he contends the Government has still not justified the warrantless search of his satchel. [*Id.*] He adds that the Government provides no reason on how the contents of his satchel would have inevitably been discovered. [*Id.*]

### A. Fourth Amendment Principles: The Inventory Search Doctrine

The Fourth Amendment of the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010)). When, as here, the Government obtains evidence from a warrantless search, then it must show by a preponderance of the evidence that an exception to the warrant requirement applies. *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). Otherwise, the exclusionary rule bars the admission of the illegally obtained evidence. *Id.*

"[T]he inventory search constitutes a well-defined exception to the warrant requirement." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983). Inventory searches promote

"strong governmental interests" by: (1) protecting an owner's property while in police custody; (2) guarding the police from unknown dangers lurking in an arrestee's personal property; and (3) insuring against claims for lost, damaged, or stolen property. *Mundy*, 621 F.3d at 287. "Lawful inventory searches must be 'conducted according to standardized criteria' or established routine, consistent with the purpose of a non-investigative search." *Id.* (quoting *Colorado v. Bertine*, 479 U.S. 367, 374 n.6 (1987)). This "tend[s] to ensure that the intrusion will be limited in scope to the extent necessary to carry out the caretaking function." *Id.* at 287-88 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976)). The government may show the existence of a "valid [standardized inventory search] procedure . . . by reference to either written rules and regulations or testimony regarding standard practices." *Id.* at 290 n.5 (first alteration in original) (quoting *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994)).

"The criteria or routine must limit an officer's discretion in two ways: first, as to *whether* to search the [property], and second, as to the *scope* of an inventory search." *Id.* at 288 (emphases in original). But the criteria or routine need not limit an officer's discretion to an "'all or nothing' fashion." *Florida v. Wells*, 495 U.S. 1, 4 (1990). The Supreme Court has recognized that the inventory search doctrine allows inventory procedures that permit officers to exercise some discretion on whether to search an item, explaining:

> A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself. Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors.

10

*Id.* And the Fourth Amendment does not "require[] an inventory search protocol to predict every conceivable scenario an officer may happen upon while conducting an inventory search, and to provide a formulaic directive for each and every one." *Mundy*, 621 F.3d at 290.

Here, SOP F4 is an "unquestionably permissible" search policy since it removes an officer's discretion on whether to search and the search's scope by mandating that the arresting officer search an arrestee on-scene before transport and to remove certain property from the arrestee's possession. *Wells*, 495 U.S. at 4. Indeed, it requires the arresting officer, upon arrest, to remove from the arrestee's "possession . . . any property dangerous to life, or which could facilitate escape[,]" as well as "purses/wallets" and to hold them in custody "until thoroughly searched." [SOP F4 at 5.] By mandating that search and removal of the arrestee's property, SOP F4 prevents "officers from engaging in the forbidden 'general rummaging in order to discover incriminating evidence.'" *United States v. Velazquez*, 2024 WL 49690, at *10 (D.N.J. Jan. 4, 2024) (upholding warrantless search of bookbag on scene as proper inventory search where department policy "afforded the officer no discretion to search [defendant's] backpack") (quoting *Wells*, 495 U.S. at 4); *see also United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993) (upholding warrantless search of satchel as a proper inventory search where "the department's policy was to search everything; the officer had no discretion"); *United States v. Wilson*, 2017 WL 11392592, at *5 (S.D. Fla. Sept. 27, 2017) (finding warrantless search of vehicle proper under inventory search exception where department policy mandated search and officer "had no discretion not to conduct an inventory search"), *aff'd*, 979 F.3d 889 (11th Cir. 2020). And SOP F4's goals to ensure officer safety and prevent harm to the arrestee or others serve several of the "strong governmental interests" underpinning the inventory search doctrine. *See Mundy*, 621 F.3d at 287.

What's more, SOP D6 is a policy "designed to produce an inventory." *Wells*, 495 U.S. at 4. All agree that SOP D6 and SOP F4 must be read together because any property or evidence an officer removes from an arrestee under SOP F4 must be "handled and processed in accordance with [SOP] D6." [SOP F4 at 7; *see also id.* at 5.] SOP D6 requires an officer to "immediately secure and process the impounded evidence/property . . . upon taking possession of" it. [SOP D6 at 7.] That policy requires the officer to handle the evidence or property "with extreme care" until the officer can determine the "items are safely secured and pose no threat to anyone." [*Id.*] The policy goes on to list how the officer must handle certain items, like digital media, computers, currency, and firearms before transport. [*Id.* at 7-8.] It then details how an officer is to mark, inventory, package, seal the property or evidence, and store it once the officer arrives at a police facility. [*Id.* at 11-13.] It also provides instructions on how to return property to the lawful owner. [*Id.* at 17-21.]

The record here reveals the officers followed SOP F4 and SOP D6. Following Savery's arrest, one officer took custody of Savery's satchel that he wore at the time of his arrest and another officer performed a cursory search. [Def. Exs. 2-3.] The investigation report prepared after Savery's arrest reveal that the officers followed SOP D6's inventory procedures by marking the items recovered from the satchel, inventorying them, packaging them, and storing them in an evidence locker "pending transport" to a police laboratory. [NJSP Investigation Report at 6-7.] Thus, given the record, the officers treated the search of Savery's satchel as an inventory search of an arrestee's possessions. The Supreme Court has already found that satchels worn by an arrestee—like the one Savery wore at the time of his arrest— fall within the scope of the inventory search doctrine. *Lafayette*, 462 U.S. at 648 (finding warrantless search of satchel that defendant wore at the time of his arrest a proper inventory

search, and holding "is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures").

And while neither SOP F4 nor SOP D6 require officers to conduct the inventory search at the scene, nothing in "the Fourth Amendment . . . require[s] that police conduct inventory searches at any particular location." *United States v. Mendez*, 315 F.3d 132, 137 n.3 (2d Cir. 2002); *see also Bertine*, 479 U.S. at 373 (explaining the Supreme Court's "opinion in *Lafayette*, . . . did not suggest that the station-house setting of the inventory search was critical to [the Court's] holding in that case"). To be sure, SOP F4 requires officers to hold an arrestee's purse or wallet "until thoroughly searched[,]" but the policy does not specify where or when. [SOP F4 at 5.]  SOP D6 requires the officers to inventory impounded property or evidence after transport "to a secure evidence processing facility[.]" [SOP D6 at 8.] Reading SOP F4 and SOP D6 together suggests officers are to search an arrestee' purse or wallet at a "secure evidence processing facility."

Still, both SOPs contemplate on-scene, after-arrest searches that apparently include opening up certain items in the arrestee's possession. [*Id.* at 7 (requiring officers "to immediately secure and *process* the impounded/evidence property . . . upon taking possession of" it (emphasis added)); *see also* SOP F4 at 5 (requiring officers to "search persons in their custody" before transport and to "remove[] from the possession of the prisoner" several categories of property).  Indeed, SOP F4 requires arresting officers to remove from an arrestee "[a]ny property dangerous to life, or which could facilitate escape[.]" [SOP F4 at 5.] How can the officer make those determinations without examining the property removed from the arrestee? *Cf. Bertine*, 479 U.S. at 373 (explaining that "[k]nowledge of the precise nature of

13

the property . . . help[s] to avert any danger to police or others that may have been posed by the property"). That said, if the officer's on-scene search of Savery's satchel deviated from SOP F4's and SOP D6's procedures, then that deviation is only a "technical violation" of the procedures that does not render the search unconstitutional. *United States v. Adames*, 304 F. App'x 129, 130-31 (3d Cir. 2008) (finding "technical violation" of government's inventory search policy did not render the inventory search unconstitutional even where law enforcement searched vehicle at scene as opposed to a law enforcement facility as required by the policy); *see also United States v. Gay*, 2022 WL 17573735, at *7 (D.S.D. Sept. 2, 2022) ("[E]ven though officers searched [defendant's] backpack in the parking lot rather than at the booking location does not defeat application of the inventory search exception so long as the search was done according to routine procedure."), *rep. and recommendation adopted as modified sub nom.*, *United States v. Tristan*, 2022 WL 16631445 (D.S.D. Nov. 2, 2022). Indeed, the "failure to follow through with standard procedures does not necessarily render the search unreasonable." *Mundy*, 621 F.3d at 293-94. So the search is constitutional.

Savery protests, arguing the police had no authority to seize his satchel following his arrest. [Def. Br. I at 9-10.] Not so. The inventory search doctrine depends on the police "hav[ing] legitimate custody of the property to be inventoried, either as a result of a lawful arrest, . . . or by some other method." *United States v. Jenkins*, 876 F.2d 1085, 1089 (2d Cir. 1989) (citations omitted). Savery does not dispute that the police had probable cause to arrest him. [Def. Reply Br. I at 13.] He also agrees that he wore the satchel at the time of his arrest. Savery cannot hide from that fact because the body camera video footage shows Savery wearing the satchel when the officers arrested him and one officer removed it from his possession after other officers handcuffed him. [Def. Exs. 2-3.] Because Savery possessed the

14

satchel during a lawful arrest, the officers could impound it as personal property and later inventory its contents.

Indeed, "[w]hen a person is arrested in a place other than his home, it may be appropriate for the arresting officers to impound the personal effects that are with [the Defendant] at the time to ensure the safety of those effects or to remove nuisances from the area." *United States v. Brantley*, 2021 WL 1921584, at *3 (D.N.J. May 13, 2021) (alteration in original, internal quotation marks omitted) (quoting *United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993)). Savery's argument that the police could have left the satchel on the porch's ledge is a non-starter. [Def. Br. I at 3-4.] The officers were not required to leave the satchel in an unsecure location or find a friend or family member to take custody of it. *See United States v. Castaneda*, 735 F. App'x 262, 264 (9th Cir. 2018). This is so because "[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means." *Lafayette*, 462 U.S. at 647.

Requiring the police to leave the satchel on the porch could expose the officers to a potential theft or damage claim say if someone comes along and takes the satchel, or the satchel is exposed to the elements. And requiring the police to turn over the satchel to a family member or friend—without knowing what's inside—could expose the officers and the would-be custodian to danger. The inventory search doctrine's purposes are to reduce that exposure. *See Bertine*, 479 U.S. at 372 (explaining "inventory search procedures serve . . . to insure against claims of lost, stolen, or vandalized property"); *see also Lafayette*, 462 U.S. at 646 ("It is immaterial whether the police actually fear any particular package or container; the need to protect against such risks arises independent of a particular officer's subjective

concerns.").  Thus, Savery's arguments that the officers had no authority to take his satchel lack support in both law and fact.

But Savery presses on, arguing the officer did not perform an inventory search because the on-scene search was a "targeted one" not designed to produce an inventory and the officer described the search in a report as a "search incident to arrest."  [Def. Reply Br. I at 10.]  This argument is unavailing.  "The mere fact that an inventory search may also have had an investigatory purpose does not . . . invalidate it."  *United States v. Frank*, 864 F.2d 992, 1001 (3d Cir. 1988).  Because SOP F4 and SOP D6 removed the arresting officer's discretion to search an arrestee's person and remove property from their possession before transport, SOP F4 at 5, SOP D6 at 7, "the presence of an investigative motive does not invalidate the inventory search."  *Bowhay*, 992 F.2d at 231.  And the officer's characterization of the search is irrelevant.  *See United States v. White*, 2020 WL 2362029, at *4 (D. Minn. Jan. 13, 2020) (rejecting defendant's argument that warrantless search of backpack and duffel bag did not qualify as an inventory search merely because the officer described it as a "search incident to arrest"), *rep. and recommendation adopted*, 2020 WL 1027144 (D. Minn. Mar. 3, 2020).[4]

## B.  The Inevitable Discovery Doctrine

Even if the officer's on-scene search of Savery's satchel is unconstitutional, the inevitable discovery doctrine still bars suppression.  The inevitable discovery doctrine allows the introduction of evidence obtained from an unlawful search "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."  *United States v. Stabile*, 633 F.3d 219, 245 (3d

---

[4] Given this Court's ruling on the inventory search exception, the Court need not reach the Government's arguments about *Mathews*' search-before-transportation exception.

Cir. 2011) (quoting *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)). The government can carry that burden "by demonstrating that the police, following their routine procedures, would have uncovered [the evidence.]" *United States v. Bradley*, 959 F.3d 551, 557 (3d Cir. 2020). The government must point to "historical facts capable of ready verification, and not speculation." *Id.* (quoting *Vasquez De Reyes*, 149 F.3d at 195).

Again, Savery does not dispute that the officers lawfully arrested him. [Def.Br. I at 13.] Because the officers lawfully arrested Savery, SOP F4 and SOP D6 establish that the police would have searched Savery's satchel at a police facility. [SOP F4 at 7; SOP D6 at 8-15.] Indeed, once at a police facility, SOP F4 required an officer to search Savery again before placing him in a holding cell. [SOP F4 at 7.] That SOP required the police to remove property from Savery's possession and directed that the "property or evidence seized or taken into custody" to "be handled and processed in accordance with [SOP] D6." [*Id.*] Up top, the Court described SOP D6's property and evidence handling procedures such as marking, inventorying, and packaging the property. The NJSP Investigation Report shows the officers followed SOP D6 when inventorying the contents of Savery's satchel. [NJSP Investigation Report at 6-7.]

So the police would have inevitably discovered the handgun, drugs, and cash in Savery's satchel during an inventory search at a police facility. *See Mathews*, 532 F. App'x at 220-21, 225 (finding handgun would have been inevitably discovered during an inventory search at police station even where the on-scene search of backpack did not qualify as an inventory search); *see also United States v. Sinkler*, 2004 WL 7320451, at *4 (M.D. Pa. Nov. 23, 2004) (refusing to suppress evidence recovered from a warrantless search of defendant's backpack, reasoning that even if the on-scene search did not qualify as an inventory search,

the officers would have inevitably discovered the evidence during a routine inventory search at the station), *aff'd*, 267 F. App'x 171 (3d Cir. 2008).  Thus, the Court denies Savery's motion to suppress.

## III.  THE MOTION TO DISMISS

Savery asks this Court to dismiss his felon-in-possession of handgun and ammunition charge under 18 U.S.C. § 922(g)(1), contending that statute, as written and applied to him, violates his Second Amendment rights to keep and bear arms.  [Def. Mem. of Law in Supp. of Mot. to Dismiss 11-25 (Def. Br. II) (Docket No. 37-1).]  Pointing to the United States Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), Savery argues the Government cannot show § 922(g)(1) falls within this "country's historical tradition of firearm regulation."  [*Id.* at 15.]  He argues that his prior convictions for "non-violent" drug offenses and resisting arrest do not justify permanent disarmament, and the Government cannot show otherwise.  [Def. Reply Mem. of Law in Supp. of Mot. to Dismiss 1-25 (Def. Reply Br. II) (Docket No. 51).]  So the law and its application to him are unconstitutional.

This Court has already considered, addressed, and rejected the very same arguments that Savery presses here.  *See generally United States v. Trusty*, 2025 WL 830124, at *1-6 (D.N.J. Mar. 17, 2025); *Velazquez*, 2024 WL 49690, at *11-14.  The Court will reject them again.

### A.  The Second Amendment:  Facial and As-Applied Challenges to § 922(g)(1)

To prevail on a facial challenge, Savery has an uphill battle because it "requires [him] to establish that no set of circumstances exists under which [§ 922(g)(1)] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (internal quotation marks omitted) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  "This is the 'most difficult challenge to

mount successfully[.]'" *Id.* (quoting *Salerno*, 481 U.S. at 745)).   And to win on his as-applied challenge, Savery must prove that "§ 922(g)(1), as applied to him, violates his Second Amendment rights to keep and bear arms." *Trusty*, 2025 WL 830124, at *2 (citation omitted). If Savery cannot show that § 922(g)(1) is unconstitutional as applied to him, then his facial challenge to that statute fails.  *See United States v. Mitchell*, 652 F.3d 387, 415 (3d Cir. 2011) (en banc) ("Because the statute is constitutional as applied to [defendant], he has not shown that 'there is no set of circumstances' under which the statute may be applied constitutionally."); *see also Velazquez*, 2024 WL 49690, at *14 (rejecting facial challenge to § 922(g)(1) where defendant could not show that the law was unconstitutional as applied to him).

The Second Amendment of the United States Constitution protects "the right of the people to keep and bear Arms." U.S. Const. amend. II.  At its core, the Second Amendment guarantees a private, individual right to keep and bear arms for self-defense.  *D.C. v. Heller*, 554 U.S. 570, 592, 595 (2008); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 791 (2010) (holding the Second Amendment "applies equally to the Federal Government and the States" and ruling the Fourteenth Amendment's Due Process Clause incorporates the Second Amendment).  The Second Amendment right to possess firearms for self-defense applies in the home, *Heller*, 554 U.S. at 635, and out in the public, *Bruen*, 597 U.S. at 32-33.

Over the past two-and-a-half-years, Second Amendment jurisprudence has evolved since the Supreme Court's decision in *Bruen*.  The Third Circuit, this Court, and many others have recounted that evolution.  *See generally Pitsilides v. Barr*, 128 F.4th 203, 208-11 (3d Cir. 2025); *Range v. Att'y Gen. U.S.*, 124 F.4th 218, 224-25 (3d Cir. 2024) (*Range II*); *Trusty*, 2025 WL 830124, at *2-4.  So there's no need for this Court to recount it again.

In short, when an individual, like Savery here, presses a Second Amendment challenge to a firearm regulation, courts must engage in a two-step, text- and history-driven analysis. *Bruen* 597 U.S. at 24.  First, courts must examine whether the "Second Amendment's text covers [the challenger's] conduct." *Id.*  If so, the Second Amendment "presumptively protects that conduct." *Id.*  Second, courts must determine whether the government has overcome that presumption by showing that the challenged firearm law "is consistent with the Nation's historical tradition of firearm regulation." *Id.*  The government can pass this historical test without submitting "historical twin[s]" or "dead ringer[s] . . . ." *Id.* at 30.  Indeed, the government need only show that "the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.  So rather than look for molds or carbon-copies, courts must look to the "principles" underlying the historical laws that the government offers to see if they are "relevantly similar" to the challenged firearm law. *Id.*; *see also id.* at 740 (Barrett. J., concurring) ("Historical regulations reveal a principle, not a mold.").

One principle that runs through this Nation's historical tradition of firearm regulation is that the government can disarm dangerous individuals and those who would endanger the public's safety if allowed a firearm.  *Pitsilides,* 128 F.4th at 210-11 (collecting cases); *accord United States v. Connelly*, 117 F.4th 269, 277-78 (5th Cir. 2024) (reviewing various historical laws, and finding "an undeniable throughline runs through these sources: Founding-era governments took guns away from those perceived to be dangerous"); *Koons v. Platkin*, 673 F. Supp. 3d 515, 562-69 (D.N.J. 2023) (finding "this Nation has a historical tradition of disarming dangerous individuals and those who endanger the public safety" after reviewing English common law, medieval English acts and government decrees, colonial disarmament

20

laws, state constitutional convention proposals, post-ratification disarmament laws, and reconstruction era disarmament laws). Indeed, "the Second Amendment's touchstone is dangerousness[.]" *Pitsilides,* 128 F.4th at 210-11 (footnote omitted) (quoting *Folajtar v. Att'y Gen.*, 980 F.3d 897, 924 (3d Cir. 2020) (Bibas, J., dissenting)).

When confronted with an as-applied challenge to § 922(g)(1), like the one Savery presses here, courts must "consider a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction, to evaluate whether he meets the threshold for continued disarmament." *Pitsilides,* 128 F.4th at 212; *see also United States v. Williams*, 113 F.4th 637, 657-58 (6th Cir. 2024) (explaining that to "determin[e] whether an individual . . . is not dangerous, and thus falls outside of § 922(g)(1)'s constitutionally permissible scope, courts . . . must focus on each individual's specific characteristics[,]" which includes examining the defendant's "entire criminal record"). "Certain categories of past convictions are highly probative of dangerousness, while others are less so." *Williams*, 113 F.4th at 658. The Sixth Circuit has identified certain crime categories to help determine whether a defendant is dangerous and thus can be disarmed:

> A person convicted of a crime is "dangerous," and can thus be disarmed, if he has committed (1) a crime "against the body of another human being," including (but not limited to) murder, rape, assault, and robbery, or (2) a crime that inherently poses a significant threat of danger, including (but not limited to) drug trafficking and burglary. An individual in either of those categories will have a very difficult time, to say the least, of showing he is not dangerous.

*Id.* at 663; *accord Pitsilides,* 128 F.4th at 213 (noting that while "residential burglary and drug dealing are not necessarily violent, they are dangerous because they often lead to violence" (quoting *Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting)).

**B.  Savery's As-Applied and Facial Challenges to § 922(g)(1) Fail**

Turning to Savery's challenges, the Court finds he passes *Bruen's* textual inquiry. Savery is among "the people" that the Second Amendment protects.  *United States v. Moore*, 111 F.4th 266, 269 (3d Cir. 2024) (holding convicted felon on supervised release "one of the 'people' whom the Second Amendment presumptively protects"); *see also Range II*, 124 F.4th at 228 (rejecting government's argument that "'felons are not among the 'people' protected by the Second Amendment'" and finding plaintiff "among 'the people' despite his . . . false statement conviction").  Savery's multitude of criminal convictions does not change that result.  *Velazquez*, 2024 WL 49690, at *12.  And § 922(g)(1) targets Second Amendment conduct:  possessing a firearm.  *Moore*, 111 F.4th at 269 ("[T]he charge at issue punishes Moore for quintessential Second Amendment conduct: possessing a handgun."); *see also Williams*, 113 F.4th at 650 (finding § 922(g)(1) "burdens" the Second Amendment "right to possess a gun" (citation and internal quotation marks omitted)).  So the Second Amendment presumptively protects Savery's possession of a firearm.  *Moore*, 111 F.4th at 269.

But Savery's challenges sputter out at *Bruen's* historical inquiry because the Government has overcome the presumption afforded to Savery given this Nation's history of disarming dangerous individuals and those who would endanger the public's safety if allowed a firearm.  *Trusty*, 2025 WL 830124, at *4-5.  The Government offers many Founding-era disarmament laws establishing that principle.  [Gov't Br. II at 21-24.]  Many courts have recognized this Nation's historical tradition of disarming dangerous individuals and those who would threaten the public's safety if armed.  *See, e.g.*, *Pitsilides,* 128 F.4th at 210-11; *Velazquez*, 2024 WL 49690, at *13; *accord Williams*, 113 F.4th at 657 ("This historical study

reveals that governments in England and colonial America long disarmed groups that they deemed to be dangerous.").

The record here reveals that Savery has lived a life of crime.  He has five separate drug-trafficking convictions, each coming on the heels of the last one.  [Gov't Br. II at 4-5.] He also has a resisting arrest conviction.  [*Id.* at 5.]  Savery's multiple drug-trafficking convictions—alone—shows that he is dangerous and "likely [to] pose[] a physical danger to others' if armed."  *Pitsilides,* 128 F.4th at 210 (second alteration in original) (quoting *Range II*, 124 F.4th at 232).  Indeed, "courts within the Third Circuit have determined that an underlying drug dealing conviction establish[s] a criminal defendant's dangerousness." *United States v. Roach*, 2025 WL 871618, at *2 (E.D. Pa. Mar. 20, 2025) (collecting cases); *see also Trusty*, 2025 WL 830124, at *4-5 (denying as-applied and facial challenges to § 922(g)(1), finding defendant's "four prior drug convictions" showed his danger to the public's safety "because *drug dealing* is inherently dangerous" (emphasis in original)).

On top of Savery's drug-trafficking convictions, his post-conviction conduct is "indicative of dangerousness[.]"  *Pitsilides,* 128 F.4th at 212.  For his last drug-trafficking conviction, Savery pled guilty in June 2014 and received a seven-year prison term with a thirty-month term of parole ineligibility.  [Gov't Br. II at 5.]  Following that conviction, Savery admits that in 2023, he was convicted in New Jersey for harassment and wandering to obtain or sell drugs.  [Def. Br. II at 2.]  There is simply no break in criminal activity. Savery's "entire criminal history" shows he "likely poses an increased risk of 'physical danger to others' if armed."  *Pitsilides,* 128 F.4th at 212 (quoting *Range II*, 124 F.4th at 232).  So enforcing § 922(g)(1) against Savery does not violate his Second Amendment rights.

23

Because Savery cannot show that § 922(g)(1) is unconstitutional as applied to him, his facial challenge to the law fails.  *Mitchell*, 652 F.3d at 405; *see also Moore*, 111 F.4th at 273 n. 5 (finding defendant's facial challenge to § 922(g)(1) failed where defendant's as-applied challenge failed because defendant could not "establish that no set of circumstances exists under which the Act would be valid" (quoting *Rahimi*, 602 U.S. at 693)).  As a result, the Court denies Savery's motion to dismiss.

## IV.  CONCLUSION

For the above reasons, the Court **DENIES** Defendant Hassan Savery's Motion to Suppress (Docket No. 36) and Motion to Dismiss (Docket No. 37).  An accompanying Order of today's date shall issue.

<u>**s/Renée Marie Bumb**</u>
RENÉE MARIE BUMB
Chief United States District Judge

Dated: April 22, 2025